IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ALLEN A. FULTON, JR., | ) | No. C 03-4709 RMW (PR) |
| Plaintiff, | ) ) | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; |
| v. | ) ) | RESOLVING PENDING MOTIONS |
| A.A. LAMARQUE, et. al., | ) ) | |
| Defendants. | ) ) ) | (Docket Nos. 28, 42, 44, 46, 51, 59, 68, 69) |

Plaintiff, a state prisoner proceeding <u>pro se</u>, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against Salinas Valley State Prison ("SVSP") officials. Defendants have filed a motion for summary judgment. Plaintiff has filed an opposition and defendants have filed a reply brief. For the reasons discussed below, the court will GRANT defendants' motion for summary judgment. The court also addresses below various additional motions filed by the parties.

### BACKGROUND[1]

Plaintiff served as Vice Chairman of the SVSP Mens Advisory Council ("MAC") in September 2002. (Complaint at 5.) Pursuant to prison regulations, the purpose of the

---

[1]The following facts are undisputed unless otherwise noted.

Order Granting Motion for Summary Judgment; Resolving Pending Motions
P:\pro-se\sj.rmw\cr.03\Fulton709msjgrant.wpd          1

1  MAC is to provide general population inmates with a voice in administrative decisions
2  that affect their welfare. (Jemison Decl. ¶ 3.) There are sixteen representatives on the
3  MAC, four from each of SVSP's four buildings, and six inmates on the MAC's executive
4  committee, including the Vice Chairman. (Id.) Defendants Sergeant Jemison, Lieutenant
5  Bruce Rankin, and Captain Michael Collier met with the MAC executive body regularly.
6  (Id. at ¶ 4.)
7        On September 25, 2002, defendants received a memorandum from the MAC
8  executive committee, including plaintiff. (Complaint at 5; Collier Decl., Ex. B.) The first
9  paragraph of the memorandum stated that inmates in Facility "A" were generally upset at
10 the prospect of losing access to the "dayroom" in the evenings, and stated that this was
11 the "straw that is breaking the camel's back as far as tolerance goes." (Collier Decl. ¶ 6
12 & Ex. B; Jemison Decl. ¶ 7.) The memorandum went on to list numerous "grievances,"
13 including complaints about medical and dental treatment, custody personnel, food,
14 visitation policies, a ban on magazines with frontal nudity, prohibition of tobacco, day-
15 room usage, classification, receiving and release of prisoners, and the availability of
16 television programs and videos. (Collier Decl., Ex. B.) The memorandum was sent to the
17 Director of the California Department of Corrections (now California Department of
18 Corrections and Rehabilitation) Edward Alameida, Deputy Director Tristan and Warden
19 A.A. Lamarque. (Complaint at 5.)
20       Plaintiff and the other MAC executive committee members met with Jemison and
21 Collier on September 25, 2002, to discuss the memorandum. (Id.) According to plaintiff,
22 Jemison became agitated and upset, and verbally admonished the MAC members for
23 sending the memorandum to the Warden, Director and Deputy Director instead of sending
24 it to him or his lieutenant. (Id.) Collier then discussed the grievances with the inmates,
25 identifying those he would address, those over which he had no control, and those that he
26 felt were unfounded. (Collier Decl. ¶¶ 7-10.) In earlier meetings, Collier had informed
27 the MAC inmates that an earlier proposal to cancel the evening dayroom program had
28 been recanted, and the evening dayroom program would continue. (Id. at ¶ 6.)

1   Collier, who had been informed of a possible inmate strike, also stated that if an inmate
2   strike should occur, inmates would be disciplined, and, according to plaintiff, Collier
3   stated, "Who do you think will win and lose?" (Complaint at 6.)
4       On September 28, 2002, Collier and Jemison learned that the general population of
5   Facility A were planning a work and hunger strike beginning on October 1, and that any
6   inmate who did not participate would be assaulted. (Collier Decl. ¶ 13; Jemison Decl. ¶
7   5.) Pursuant to SVSP's Operation Procedure 23.6.3, Collier authorized a prison-wide
8   investigation into who incited the strike, including interviewing inmates and searching
9   cells. (Collier Decl. ¶ 13.) Operational Procedure 23.6.3 requires interviewing all
10  inmates who may have information about a threat to the safety of the prison. The
11  interviews are conducted in a private office, and the inmate is not disciplined if he refuses
12  to answer questions. (Id. at ¶ 14.)
13      Jemison and Collier interviewed plaintiff and the other members of the MAC
14  executive committee on September 28 and September 30, 2002. (Id.; Jemison Decl. ¶ 12;
15  Collier Decl. ¶ 16.) According to plaintiff, he was told that he would be placed in
16  administrative segregation if he did not reveal the names of the individuals responsible
17  for the strike. (Complaint at 6-8.) According to Collier and Jemison, they explained to
18  plaintiff that he would be placed in administrative segregation and disciplined only if he
19  violated prison regulations requiring inmates to attend work assignments and prohibiting
20  inciting violence or prison disorder, and that the appropriate avenue for pursuing
21  grievances is by filing administrative appeals. (Jemison Decl. ¶ 12; Collier Decl. ¶ 16;
22  see 15 Cal Code Regs. §§ 3005, 3040.) Plaintiff and the other MAC members provided
23  no information about the strike in the interviews. (Complaint at 6-8.) Collier had learned
24  from confidential informants that plaintiff and another inmate (Kor) had incited the strike,
25  which would include assaults on any non-participating inmates. (Collier Decl. ¶ 16.)
26  Plaintiff did not comment when informed of this intelligence, and Collier informed
27  plaintiff that he would be issued a Rules Violation Report ("RVR") for violating 15 Cal.
28  Code Regs. § 3005, which prohibits inciting behavior that might lead to disorder and

violence.  (Id.; Complaint at 6-8.)  On October 4, 2002, plaintiff was placed in administrative segregation pending the outcome of his disciplinary proceedings.[2]  (Id.)

The general population inmates in Facility "A" went on strike on October 1, 2002, refusing to attend work assignments for approximately eight days, and refusing meals for three days.  (Complaint at 6-8.)  In addition, inmates refused to attend housing classification hearings.  (Jemison Decl. ¶ 18.)  The work stoppage disrupted the operation of SVSP insofar as Facility A inmates worked in the kitchen that fed all of the inmates at SVSP three times a day, and also served as laundry workers, clerks and porters, among other jobs.[3]  (Collier Decl. ¶ 15.)  When the strike began, defendant Warden Lamarque placed Facility A on a "modified program," which canceled religious services, telephone calls, dayroom, canteen, recreation and package delivery.  (Id. at ¶ 19.)  Some inmates who accepted meals during the three-day food strike were later assaulted or requested a transfer out of fear of assault.  (Id. at ¶ 20; Decl. Collier Under Seal ¶¶ 5, 8, 9.)  The modified program ended on October 15.  (Collier Decl. ¶ 20.)

Jemison filed an RVR against plaintiff for "inciting a work stoppage," in violation of 15 Cal. Code Regs. § 3005, but the RVR was not provided to plaintiff within thirty days of the alleged misconduct, as required by 15 Cal. Code Regs. § 3320(a).  (Complaint at 8-9.)  Following plaintiff's placement in administrative segregation on October 4, 2002, the Institutional Classification Committee ("ICC") conducted a hearing on October 10 regarding such placement.  (Ugaz Decl. Ex. C.)  Plaintiff received notice of the hearing, but was not allowed to attend.  (Complaint at 8-9.)  The ICC decided to keep plaintiff in administrative segregation pending the outcome of the investigation into whether he incited the strike.  (Ugaz Decl. Ex. D.)  In connection with the investigation, Collier submitted confidential memoranda, which memoranda plaintiff asserts are

---

[2] Kor and plaintiff were briefly placed in Facility "B" general population until cells in administrative segregation became available.

[3] There were approximately 1,019 general population inmates in Facility A, the majority of whom participated in the strike.

1  unsubstantiated, identifying plaintiff as organizing the strike.  (Complaint at 9-11; Collier
2  Decl. Under Seal ¶¶ 6, 7, 10, Exs. C, D, G.)  The ICC reviewed plaintiff's placement in
3  administrative segregation again on January 9, 2003, and concluded that he should remain
4  there pending the disciplinary proceedings.  (Ugaz Decl. Exs. E, F.)

5        Plaintiff's RVR hearing was held on January 14, 2003, and continued to January
6  20, 2003.  (Id. at 11-12.)  The hearing officer dismissed the charges of inciting a work
7  stoppage because of various procedural defects and insufficient evidence, including
8  unreliable confidential memoranda.  Based on the dismissal of these charges, on January
9  30, 2003, the ICC released plaintiff from administrative segregation and the time credits
10 he lost while in administrative segregation were restored to him.  (Ugaz Decl. Ex. G.)

11       While in administrative segregation, plaintiff was denied participation in the
12 recreational yard, his legal materials were confiscated, and he had limited access to the
13 law library and legal materials.  (Complaint at 9-11.)  Plaintiff had a medical malpractice
14 lawsuit in state court that was dismissed during his stay in administrative segregation.
15 (Id. at 14.)

16       Plaintiff claims that as a result of defendants' conduct he has suffered severe stress
17 and emotional depression; he was seen by a psychologist and treated with medication for
18 his depression.  (Id. at 15-16.)

19                                **DISCUSSION**
20 A.    Standard of Review
21       Summary judgment is proper where the pleadings, discovery and affidavits
22 demonstrate that there is "no genuine issue as to any material fact and that the moving
23 party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
24 those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477
25 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient
26 evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.
27       The party moving for summary judgment bears the initial burden of identifying
28 those portions of the pleadings, discovery and affidavits which demonstrate the absence

1  of a genuine issue of material fact. <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317, 323 (1986).
2  Where the moving party will have the burden of proof on an issue at trial, it must
3  affirmatively demonstrate that no reasonable trier of fact could find other than for the
4  moving party. But on an issue for which the opposing party will have the burden of proof
5  at trial, as is the case here, the moving party need only point out "that there is an absence
6  of evidence to support the nonmoving party's case." <u>Id</u>. at 325.

7  Once the moving party meets its initial burden, the nonmoving party must go
8  beyond the pleadings and, by its' own affidavits or discovery, "set forth specific facts
9  showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only
10 concerned with disputes over material facts and "factual disputes that are irrelevant or
11 unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248
12 (1986). It is not the task of the court to scour the record in search of a genuine issue of
13 triable fact. <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party
14 has the burden of identifying, with reasonable particularity, the evidence that precludes
15 summary judgment. <u>Id.</u> If the nonmoving party fails to make this showing, "the moving
16 party is entitled to judgment as a matter of law." <u>Celotex Corp v. Catrett</u>, 477 U.S. at
17 323.

B.   <u>Plaintiff's Claims</u>

    1.   <u>First Amendment and Retaliation</u>

Plaintiff claims that defendants placed him in administrative segregation and instituted disciplinary proceedings against him in retaliation for his exercising his First Amendment rights.

The First Amendment prohibits government officials from "abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I. Prisoners retain those First Amendment rights not inconsistent with their status as prisoners or with legitimate penological objectives of the corrections system. See <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974). Although a prisoner does not lose all First Amendment protections when he enters prison, <u>id.</u>, the "inmate's 'status as a prisoner'

and the operational realities of a prison dictate restrictions on the associational rights among inmates." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125-26 (1977).  Prison regulations and actions by prison officials that infringe on an inmate's First Amendment rights of free association and free speech are valid so long as they are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see Shaw v. Murphy, 532 U. S. 223, 229 (2001).

Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983 as a violation of the plaintiff's First Amendment rights.  See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

Defendants have submitted evidence that they placed plaintiff in administrative segregation and instituted disciplinary proceedings against him because they believed he was going to instigate the strike.  The evidence that Jemison and Collier believed plaintiff had instigated the strike is uncontradicted; Jemison and Collier were informed as much by confidential informants,[4] and they believed the language in the MAC memorandum, signed by plaintiff, that the recent dayroom restriction was the last "straw . . . as far as tolerance goes" constituted a threat of the strike.

To the extent defendants segregated and instituted disciplinary proceedings against plaintiff because they believed he instigated the strike, this does not amount to retaliation for the exercise of a constitutional rights because plaintiff had no First Amendment right

---

[4]The court considers this evidence not for its hearsay purpose, i.e. to show the truth of the matter asserted that plaintiff did in fact instigate the strike.  Rather, the relevance of the evidence of what the defendants had heard is for the non-hearsay purpose of demonstrating their beliefs and reasons for segregating plaintiff.

Order Granting Motion for Summary Judgment; Resolving Pending Motions
P:\pro-se\sj.rmw\cr.03\Fulton709msjgrant.wpd          7

to instigate the strike. The evidence is uncontradicted that the strike included assaults and the threat of assaults on inmates who did not participate. In addition, the work stoppage threatened to prevent the orderly operation of the prison, including the preparation and disbursement of meals to the inmates. Preventing such a strike, and disciplining inmates responsible for instigating such a strike, is certainly reasonably related to the legitimate penological goal of preserving inmate safety and prison security. See Beards v. Banks, 126 S. Ct. 2572, 2578 (2006) (although normally the court draws all justifiable inferences in the non-movant's favor at the summary judgment stage, in disputed matters of professional judgment, the court's inferences must accord deference to the views of prison authorities).

      Plaintiff makes the conclusory allegation, but provides no evidence showing that defendants placed him on administrative segregation and instigated disciplinary proceedings against him because of his participation in the MAC and his writing the MAC memorandum. Retaliation is not established simply by showing adverse activity by defendant after protected speech; rather, plaintiff must show a nexus between the two. See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000). It is undisputed that plaintiff had previously been allowed to freely participate in the MAC and other MAC activities when they did not include threatening a work stoppage, hunger strike, and assaults on other inmates. Defendants' reliance on plaintiff's signing the MAC memorandum as evidence that plaintiff was a strike instigator does not amount to "retaliation" for writing the memorandum. Rather, it was simply one piece of evidence, along with the confidential information defendants had received, that led defendants to believe that plaintiff had instigated the strike. Defendants' declarations and other evidence described above indicates that it was their belief that plaintiff was a strike instigator, and not plaintiff's general association with the MAC or his act of writing a

Order Granting Motion for Summary Judgment; Resolving Pending Motions
P:\pro-se\sj.rmw\cr.03\Fulton709msjgrant.wpd    8

1  memorandum, that led defendants to segregate plaintiff and file the RVR against him.[5]

2  Plaintiff also states that when Collier and Jemison interviewed him in connection
3  with their investigation, they threatened to put him in administrative segregation if he did
4  not inform them which inmates were responsible for instigating the strike.  Defendants
5  deny making this threat, but even assuming it to be true, as the court must do at this stage,
6  this would not amount to retaliation for the exercise of a constitutional right because
7  plaintiff did not have a constitutional right to remain silent in that interview.  The
8  interview with Collier and Jemison was not a criminal proceeding that would implicate
9  the Fifth Amendment privilege against self-incrimination.  See Baxter v. Palmigiano, 425
10 U.S. 308, 316 (1976) (no violation of Fifth Amendment privilege where inmate faced 30
11 days in punitive segregation and downgrade of prison classification status if he remained
12 silent at prison disciplinary hearing); see also Minnesota v. Murphy, 465 U.S. 420 (1984)
13 (no Fifth Amendment compulsion where defendant faced being returned to prison for 16
14 months if he did not answer probation officer's questions about other crimes).[6]
15 Moreover, defendants could properly draw the adverse inference from plaintiff's silence
16 that he was involved in instigating the strike.  See Baxter, 425 U.S. at 319-20 (the rule
17 that no adverse inference may be drawn from a defendant's assertion of the Fifth
18 Amendment privilege does not apply in the context of prison disciplinary proceedings).

19 Defendants' evidence demonstrates that their motivation behind segregating
20 plaintiff was the legitimate penological purpose of preventing an inmate work-stoppage
21 and hunger strike, as well as possible assaults on inmates, and not the impermissible
22 purpose of retaliating against plaintiff for the legitimate exercise of his constitutional

---

[5]Similarly, plaintiff's assertion that defendants acted because plaintiff filed administrative appeals and contacted the state inspector general's office is supported by no evidence of a nexus between these actions by plaintiff and defendants' segregating plaintiff.  The only evidence of defendants' reasons for segregating plaintiff is that they believed that he had instigated the strike.

[6]Plaintiff cites no authority, and the court is aware of none, that the First Amendment might protect his right to *not* speak under the circumstances.

1 rights. To the extent plaintiff asserts to the contrary, these assertions, even if true, do not
2 present evidence that defendants retaliated against him for constitutionally protected
3 activity. Accordingly, there is no genuine issue of material fact as to plaintiff's retaliation
4 and First Amendment claims, and defendants are entitled to summary judgment on such
5 claims.

      2.      Due Process

7 Plaintiff claims that his right to due process was violated in connection with his
8 placement in administrative segregation and the disciplinary proceedings regarding the
9 charge of inciting a strike at SVSP.

10 The Supreme Court has held that prisoners have no constitutional right or interest
11 independently protected by the Due Process Clause to be free from discipline or
12 placement in administrative segregation. Hewitt v. Helms, 459 U.S. 460, 468 (1983).
13 Allegations by a prisoner that he was denied due process in connection with the decision
14 to administratively segregate or discipline him present a constitutionally cognizable claim
15 if: (1) prison officials are narrowly restricted by state statutes or regulations to impose the
16 specific deprivation at play, and (2) the liberty in question is one of "real substance."
17 Sandin v. Conner, 515 U.S. 472, 477-487 (1995).

18 Plaintiff's temporary placement in administrative segregation pending his
19 disciplinary proceedings does not implicate a liberty interest of "real substance" within
20 the meaning of Sandin. A liberty interest of "real substance" generally will be limited to
21 freedom from (1) restraint that imposes "atypical and significant hardship on the inmate
22 in relation to the ordinary incidents of prison life," id. at 484, or (2) state action that "will
23 inevitably affect the duration of [a] sentence," id. at 487. Here, the charges were
24 dismissed against plaintiff and no discipline was imposed. Furthermore, there is no
25 dispute that the duration of plaintiff's sentence was unaffected because officials restored
26 all time credits to plaintiff when the charges were dismissed. Finally, plaintiff's
27 placement in administrative segregation was temporary, not indefinite. See Serrano v.
28 Francis, 345 F.3d 1071, 1078 (9th Cir. 2003) (placement in segregated housing in and of

itself does not implicate a protected liberty interest); May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997) (mere placement in administrative segregation not enough to state due process claim after Sandin); see, e.g., Sandin, 515 U.S. at 485-86 (inmate's thirty-day placement in disciplinary segregation, where conditions mirrored conditions in administrative segregation, not a deprivation of "real substance"); Mujahid v. Meyer, 59 F.3d 931, 932 (9th Cir. 1995) (under Sandin no liberty interest when inmate placed in disciplinary segregation for fourteen days); cf. Wilkinson v. Austin, 125 S. Ct. 2384, 2394-95 (2005) (indefinite placement in a "supermax" facility, where they are not eligible for parole consideration, imposes an "atypical and significant hardship within the correctional context"). Without more, plaintiff's temporary placement in administrative segregation pending disciplinary proceedings, particularly where, as here, there is no evidence of any effect on plaintiff's sentence or parole or an "atypical or significant hardship," does not establish a deprivation of "real substance" under Sandin.[7]

     In the absence of any evidence that plaintiff's temporary stay in administrative segregation amounted to a deprivation of "real substance", there is no genuine issue of material fact as to the violation of his right to a liberty interest protected by due process. Accordingly, defendants are entitled to summary judgment on plaintiff's due process claim.

     3.     Equal Protection

     Plaintiff alleges that his right to equal protection was violated because he was treated differently from the other members of the MAC executive committee. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to

---

[7]Furthermore, plaintiff's allegation that defendants submitted false confidential memoranda that plaintiff instigated the strike, even if true, does not amount to a due process violation. See Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (prisoners have no constitutional immunity from being falsely or wrongly accused of conduct which may result in discipline); Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986) (same); Hanrahan v. Lane, 747 F.2d 1137, 1140-41 (7th Cir. 1984) (allegations of a false or fabricated disciplinary charge against an inmate fail to state a claim under § 1983).

any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).  When challenging his treatment with regard to other prisoners, courts have held that in order to present an equal protection claim a prisoner must allege that his treatment is invidiously dissimilar to that received by other inmates.  More v. Farrier, 984 F.2d 269, 271-72 (8th Cir. 1993) (absent evidence of invidious discrimination, federal courts should defer to judgment of prison officials).

There is no evidence of invidious discrimination in this case.  The undisputed evidence demonstrates that Collier and Jemison sent plaintiff and Kor to administrative segregation based on confidential information that plaintiff and Kor had instigated the strike.  There is no evidence that Collier and Jemison had similar information about any other MAC members.  Although plaintiff was ultimately found not guilty of instigating the strike, the confidential information that defendants had about plaintiff was unlike any information they had about other MAC members.  As such, plaintiff was not similarly situated to the other MAC members, and defendants had a rational basis for treating him differently.  Accordingly, defendants are entitled to summary judgment on plaintiff's equal protection claim.[8]

4.   Access to the Courts

Plaintiff claims that while he was in administrative segregation, his legal paperwork and books were taken from him and that his law library access was limited. Plaintiff states in his declaration that officials confiscated his legal materials on September 30, 2002, when he was moved from Facility A and eventually into administrative segregation, and returned the materials to him on February 11, 2003, after

---

[8]Defendants argue that plaintiff abandoned this claim and the access to courts claim, discussed below, at his deposition.  Plaintiff states that he did not mean to abandon them.  The court need not address these arguments as the claims are resolved on their merits.

he was released from administrative segregation.  (Fulton Decl. ¶ 59.)

Prisoners have a constitutional right of access to the courts.  See Lewis v. Casey, 518 U.S. 343, 350 (1996); Bounds v. Smith, 430 U.S. 817, 821 (1977).  To establish a claim for any violation of the right of access to the courts, the prisoner must prove that there was an inadequacy in the prison's legal access program that caused him an actual injury.  See Lewis, 518 U.S. at 350-55.

There is no evidence that plaintiff suffered an "actual injury" in this case. Destruction or confiscation of legal work may violate an inmate's right to access to the courts, see Vigliotto v. Terry, 873 F.2d 1201, 1202 (9th Cir. 1989), but only if the plaintiff can establish actual injury, see Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir. 1989). To prove an actual injury, the prisoner must show that the inadequacy in the prison's program hindered his efforts to pursue a non-frivolous claim concerning his conviction or conditions of confinement.  See Lewis, 518 U.S. at 354-55.

Plaintiff states that at the time he was placed in administrative segregation he had a medical malpractice lawsuit pending in Kings County Superior Court.  (Fulton Decl. ¶ 60 & Ex. N.)  According to plaintiff he could not "finish the work [he] started" on that case. (Id. at ¶ 60.)  The docket sheet from that case indicates that a motion for summary judgment had been filed in May 2002, plaintiff had filed an opposition in July 2002, and the motion had been granted on September 16, 2002.  (Id. at Ex. N.)  As the summary judgment motion was briefed and resolved prior to the confiscation of his legal papers, said confiscation could not have hindered his efforts with respect to the summary judgment motion.

Following the grant of summary judgment motion, on October 1, 2002, a demurrer was filed.[9]  (Id. at ¶ 63 & Ex. N.)  The docket sheet belies plaintiff's claim that he "could not respond" to the demurrer.  The docket sheet demonstrates that plaintiff filed a request for leave to amend the complaint on October 18, 2002.  (Id.)  Thereafter, and while in

---

[9]The record does not indicate why a demurrer was filed after summary judgment was granted, but presumably it related to different defendants.

1  administrative segregation, plaintiff requested and received two extensions of time to
2  oppose the demurrer (until January 23, 2003), a status conference was held with plaintiff
3  appearing by telephone, plaintiff filed an opposition to the demurrer on January 13, 2003,
4  and the demurrer was ultimately sustained on January 23, 2003.  (Id. at Ex. N.)  Plaintiff
5  states, with respect to his January 13, 2003 opposition to the demurrer, that he "had to just
6  put something together or have my case dismissed for failure to prosecute."  (Id. at ¶ 65.)
7  However, plaintiff does not describe what he would have said differently in his
8  opposition if he had access to his legal papers or had more time.  Nor is there any
9  evidence plaintiff requested a further extension of time to properly prepare his demurrer
10 as he had done successfully two previous times, much less that the court denied such a
11 request or informed plaintiff that the case was on the verge of dismissal for failure to
12 prosecute.  Plaintiff also presents no allegation, evidence or explanation as to why he did
13 not seek reconsideration, ask to reopen, or file an appeal of the superior court's sustaining
14 the demurrer after his legal papers were returned to him on February 11, 2003.  (See id. at
15 Ex. N.)  The simple fact that the demurrer was granted does not on its own indicate that
16 plaintiff's efforts to oppose the demurrer were hindered; the demurrer might just as well
17 have been granted because plaintiff's claims were meritless or frivolous.

18      In addition, the court notes that plaintiff has presented no evidence that the
19 medical malpractice claims he was pursuing in state court were "non-frivolous", as is
20 required to establish "actual injury" under Lewis.  See Lewis, 518 U.S. at 354-55.
21 Plaintiff does not describe his claims other than to say that they were for medical
22 malpractice.  Plaintiff also does not submit the complaint or any of the documents from
23 the case that might indicate that they were not frivolous.

24      In light of plaintiff's evident ability to substantially litigate the case before and
25 during his stay in administrative segregation, and without any evidence as to what specific
26 efforts by plaintiff with respect to the case were hindered by defendants, there is no
27 genuine issue of material fact that plaintiff suffered any actual injury from the temporary
28 confiscation of his legal papers.  In addition, plaintiff has failed to present evidence that

his medical malpractice claims were non-frivolous. Accordingly, defendants are entitled to summary judgment on the claim.

## CONCLUSION

The court concludes that plaintiff has failed to raise a genuine issue of material fact as to any constitutional violation and that defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment (Docket No. 28) is GRANTED.

In light of the granting of this motion, plaintiff's motion for appointment of counsel (Docket No. 42), to compel discovery[10] (Docket No. 68), and defendants' motion to stay discovery (Docket No. 44) are DENIED as moot.

For want of any cause shown, and as the court has not relied on plaintiff's deposition testimony in ruling on the present motion, plaintiff's motion to suppress his deposition transcripts (Docket No. 46) and defendants' motion to strike plaintiff's proposed changes to his deposition testimony (Docket No. 51) are DENIED.

Good cause appearing, plaintiff's motion for a copy of the court docket (Docket No. 59) is GRANTED. The clerk shall mail plaintiff a copy of the docket sheet along with this order.

///
///
///
///
///

---

[10] As plaintiff filed this motion after the motion for summary judgment, the court further notes that the motion sets forth no basis for relief from summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. First, the motion makes no showing that plaintiff is entitled to the requested discovery, much of which is confidential and has been placed under seal, and second, the motion does not explain or indicate how the requested discovery would affect plaintiff's ability to oppose the motion for summary judgment. See Fed. R. Civ. P. 56(f).

1  Plaintiff's motion for an "in camera hearing" of defendants' personnel records
2  (Docket No. 69) pursuant to the California Rules of Civil Procedure and the California
3  Evidence Code, which do not apply to this action, is DENIED.
4  The clerk shall terminate all pending motions, enter judgment and close the file.
5  IT IS SO ORDERED.
6  DATED: 3/28/08

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge